## No. 12-4011

## In the
## United States Court of Appeals
## for the Sixth Circuit

ASHLEY WASHBURN,

*Plaintiff - Appellant,*

v.

LAWRENCE COUNTY BOARD OF COMMISSIONERS, ET AL.,

*Defendants - Appellees.*

*Appeal of Judgment of United States District Court
for the Southern District of Ohio*

## APPELLANT ASHLEY WASHBURN'S BRIEF

William L. Mundy (OH 0066163)
MUNDY & ASSOCIATES
P.O. Box 2986
Huntington, WV  25728
Tel. (304) 525-1406
Fax. (304) 525-1412
wlmundy@mundynelson.com

Michael A. Woelfel (WV 04106)
Matthew J. Woelfel (WV 10393)
WOELFEL & WOELFEL LLP
801 8th Street
Huntington, WV 25701
Tel. (304) 522-6249
Fax. (304) 522-9282
mikewoelfel@woelfelpi.com

David E. Mills (OH 0075400)
*Counsel of Record*
THE MILLS LAW OFFICE LLC
1300 West Ninth Street, Suite 636
Cleveland, OH 44113
Tel. (216) 929-4747
Fax. (202) 379-1767
dm@MillsFederalAppeals.com

*Counsel for Ashley Washburn*

November 13, 2012

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 12-4011 _____    Case Name: Washburn v. Lawrence Cty. Bd. et al. ____

Name of counsel: David E. Mills _____

Pursuant to 6th Cir. R. 26.1, Ashley Washburn _____
                               *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

## CERTIFICATE OF SERVICE

I certify that on _____ September 10, 2012 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ David E. Mills _____

_____

_____

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Table of Contents ........................................................................................ i

Table of Authorities ................................................................................... iii

Statement in Support of Oral Argument ................................................... vi

Introduction ................................................................................................ 1

Jurisdictional Statement ............................................................................ 2

Statement of the Issues ............................................................................. 3

Statement of the Case ................................................................................ 4

Background ................................................................................................. 6

Summary of Argument .............................................................................. 16

Argument .................................................................................................... 18

I.  DUTY EXISTS:  The County and Attitude Owed a Duty to Washburn Because They Had Control Over the Exterior Hangar Door that Struck Her on the Airpark Grounds ........................................................... 20

    A.  Premises liability involving leased space turns on the control over the portion of the premises that is hazardous. ................................. 21

        1.  *A defect **inside** the leased space might not involve owner/operator control.* ................................................................. 22

        2.  *A defect on the **exterior** of a leased space will involve some owner/operator control.* ................................................. 23

    B.  Both Defendants had control over the exterior hangar door that struck Washburn on the airpark grounds. ................................. 30

        1.  *The County had control over the exterior hangar door.* ........... 32

        2.  *Attitude also had control over the exterior hangar door.* .......... 36

II. EXTENT OF DUTY: The County And Attitude Owed Washburn a Duty of Ordinary Care Because She Was an Invitee. ......................................38

III. BREACH: A Jury Could Conclude That Both Defendants Breached Their Duty of Ordinary Care Because They Never Inspected The Hangar Door to See If It Was Defective And Dangerous. ..............................43

Conclusion.................................................................................................. 48

Certificate of Compliance ..........................................................................49

Certificate of Service...................................................................................50

Addendum: Designation of Relevant District Court Documents..........................51

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)……………………………………………………..18

*Andler v. Clear Channel Broadcasting, Inc.*,
    670 F.3d 717 (6th Cir. 2012)…………………………………………*passim*

*Attitude Aviation, Inc., v. XL Specialty Ins. Co.*,
    No. 1:12-cv-515 (S.D. Ohio)………………………………………………….5

*Both v. Harband*,
    331 P.2d 140 (Cal. Ct. App. 1958)……………………...………….……25, 45

*Bowins v. Euclid General Hosp.*,
    484 N.E.2d 203 (Ohio Ct. App. 1984)……………………………………..39

*Brown v. Cleveland Baseball Co.*,
    106 N.E.2d 632 (Ohio 1952)……………….…..………………..22, 27, 28, 35

*Bussard v. Ohio Dep't of Transp.*,
    507 N.E.2d 1179 (Ct. Cl. Ohio 1986)…………...………………….…….45

*Chilcutt v. Ford Motor Co.*,
    662 F. Supp. 2d 967 (S.D. Ohio 2009)………………….…..………...34

*Davet v. City of Cleveland*,
    456 F.3d 549 (6th Cir. 2006)……………………………….……….18

*Friedl v. Lackman*,
    23 N.E.2d 950 (Ohio 1939)……………………………….............*passim*

*Fryberger v. Lake Cable Recreation Assoc., Inc.*,
    533 N.E.2d 738 (Ohio 1988)……………………………………....*passim*

*Hendrix v. Eighth and Walnut Corp.*,
     438 N.E.2d 1149 (Ohio 1982)……………………………………..22, 27, 35

*Klein v. Kroger Co.*,
     1997 Ohio App. LEXIS 176 (Ohio Ct. App. Jan. 24, 1997)……………..45

*Lang v. Holly Hill Motel, Inc.*,
     909 N.E.2d 120 (Ohio 2009)……………………………………………….34

*Liebowitz v. U.S. Office Holdings, L.P.*,
     2011 Ariz. App. Unpub. LEXIS 757 (Ariz. Ct. App. May 31, 2011)…..*passim*

*Loudin v. Radiology & Imaging Servs.*,
     948 N.E.2d 944 (Ohio 2011)……………………………………………….18

*Monahan v. Duke Realty*,
     2008 Ohio 1113 (Ohio Ct. App. 2008)……………… ……………22, 27, 35

*Munger v. Union Savings & Loan Assoc.*,
     27 P.2d 709 (Wash. 1933)……………………………..…..25, 27, 30, 35

*Provencher v. Ohio Dep't of Transp.*,
     551 N.E.2d 1257 (Ohio 1990)……………….......………………… 39, 41, 43

*Ray v. Ramada Inn N.*,
     869 N.E.2d 95 (Ohio Ct. App. 2007)………………………..…………….39

*Rutherford v. Columbia Gas*,
     575 F.3d 616 (6th Cir. 2009)……………………………….....……..43

*Shump v. First Continental–Robinwood Assocs.*,
     644 N.E.2d 291 (Ohio 1994)…………………………………………40

*Siddons v. Business Props. Dev. Co.*,
     953 P.2d 902 (Ariz. 1998)……………………………………….…..*passim*

*Souther v. Preble Cnty. Dist. Library*,
     2006 Ohio 1893 (Ohio Ct. App. 2006)…..……….....…….…..……..39, 43

iv

*Stackhouse v. Close*,
  94 N.E.2d 746 (Ohio 1911)………………………………………….…..32, 45

*U.S. Specialty Ins. Co. v. Attitude Aviation, Inc.*,
  No. 1:11-cv-742 (S.D. Ohio)……………………………………….…...…….5

*Yahn v. Mahoning Nat'l Bank*,
  446 N.E.2d 1132 (Ohio Ct. App. 1982)…………………..……...……43, 45

**Statutes**

28 U.S.C. § 1291……………………………………………………...………..2

28 U.S.C. § 1332………………………………………………………...……..2

49 U.S.C. § 47107………………………………………………...…….…9

**Rules**

Fed. R. App. P. 34………………………………………………………….…iv

6th Cir. R. 34………………………………………………………….…iv

vi

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Ashley Washburn requests oral argument under Federal Rule of Appellate Procedure 34(a)(1) and Sixth Circuit Rule 34(a).  Oral argument will assist this Court as it assesses whether the district court made fundamental mistakes regarding the basic tort principles underlying Ohio's premises-liability law.

## INTRODUCTION

When Ashley Washburn was 27 years old, she suffered traumatic brain injury and was nearly killed while on the grounds of a public airpark when a hangar door flew off of its hangar into the air, and then swooped down, striking her head. Lawrence County owned the property, controlled activity on the general grounds, and had to give approval to any structural changes—including to the hangars it leased to individuals. Attitude Aviation ran the airpark, and agreed to maintain safety. Thus, they both had control over the exterior hangar door and owed Washburn a basic duty of ordinary care while she was on the airpark grounds. They admit they never maintained or inspected these old doors, so they breached that duty. Yet the district court adopted their view that they have no responsibility for this basic safety at their airpark—and that it is exclusively the hands of folk such as 82-year-old Cleo Watson who stored a plane inside the hangar for $100 per month and showed up from time to time. This misguided (and dangerous) view is unsupportable under elementary tort law, which calls for a trial here. If, at trial, the County and Attitude want to point fingers at each other or at Cleo Watson to apportion responsibility amongst themselves for Ashley Washburn's injuries, they are free to try that tactic. But there was no authority for granting summary judgment and cutting this case short before such a trial. This Court should reverse.

1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332 (diversity).  This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's July 24, 2012 judgment is a final order.  (Judgment; R. 154; Page ID #2604.)  Washburn filed a timely notice of appeal on August 21, 2012.  (Notice of Appeal; R. 155; Page ID #2645.)

## STATEMENT OF THE ISSUES

1. **Existence of Duty.** Did the County and Attitude owe any duty to Washburn when she was injured by an exterior hangar door on public airpark grounds, which were owned by the County and managed by Attitude? Or, in other words, did the fact that the hangar happened to be leased to Cleo Watson who came by from time to time eliminate all control and responsibility on their part?

2. **Extent of Duty.** This Court recently held, under Ohio law that controls here, that a person visiting friends staying at a campground was an invitee who was owed a duty of ordinary care by the campground owner. Was Washburn also owed a duty of ordinary care when she similarly visited friends at the airpark?

3. **Breach.** The County and Attitude admit that they never inspected the exterior hangar doors for dangerous conditions, and yet they further claim that they did not breach any duty because they lacked notice of any danger. Can defendants create their own lack of notice by failing to maintain or inspect their property? Or is the truth that lack of notice operates as a defense only when the defendant is already acting with ordinary care by maintaining the property?

## STATEMENT OF THE CASE

Ashley Washburn brought this diversity negligence action against the Lawrence County Board of Commissioners ("the County") and Attitude Aviation, Inc., ("Attitude") in the District Court for the Southern District of Ohio on July 15, 2010.  (Compl.; R. 1; Page ID #1.)  The County filed a cross-claim against Attitude, contending that Attitude had agreed to indemnify the County for damages and legal fees in cases such as this.  (Cross Claim; R. 31; Page ID #124.)  After discovery, Washburn moved for partial summary judgment against both Defendants on the elements of duty and breach.  (Washburn SJ Mem.; R. 107-1; Page ID #932.)  The County and Attitude opposed that motion and also moved for summary judgment against her.  (County SJ Mem.; R. 131-1; Page ID #2229. Attitude SJ Mem.; R. 128; Page ID #2183.)  The County and Attitude additionally moved for partial summary judgment against each other regarding the County's cross-claim.  (County Cross SJ Mem.; R. 129; Page ID #2206. Attitude Cross SJ Mem.; R. 128; Page ID #2183.)  On July 24, 2012, the district court granted both the County's and Attitude's motions for summary judgment against Washburn, and the court denied her motion for partial summary judgment against them.  (SJ Op.; R. 153; Page ID #2605.)  This decision rendered moot the County's cross-claim against Attitude.  (*Id.* at 40; Page ID #2644.)

4

The decision also stopped proceedings in two separate actions regarding the obligations of the County's and Attitude's insurance carriers related to this case. *See U.S. Specialty Ins. Co. v. Attitude Aviation, Inc.*, No. 1:11-cv-742 (S.D. Ohio) (suit by Attitude's insurer seeking declaration that it was not obligated to defend or indemnify the County—dismissed without prejudice); *Attitude Aviation, Inc., v. XL Specialty Ins. Co.*, No. 1:12-cv-515 (S.D. Ohio) (suit by Attitude against the County's insurer seeking defense and indemnification coverage—stayed pending this appeal).

## BACKGROUND

Ashley Washburn grew up in Beckley, West Virginia. She loved being active, and she was on her high-school dance team and softball team. She attended Marshall University, obtaining a degree in computer programming, with a minor in management. After graduation, she began working at the Autism Services Center, helping people with mental disabilities. (Washburn Dep.; R. 116 at 7–17; Page ID #1401–05.) She was living life to the fullest—she even started skydiving at the Lawrence County Airpark. But one Sunday afternoon when she was just 27, as she was helping others on the grounds of the airpark, her life was shattered by a dangerous exterior hangar door that struck her.

The County has owned the airpark since 1936. (Attitude Lease; R. 129-2 at 3; Page ID #2218.) Looking down at it from an aerial view, the airpark property has a runway near the bottom (southern) edge that runs left to right (east to west). (Stephens Dep.; R. 110 Ex. 24; Page ID #1215.) Two rows of hangars run parallel to the runway north of it, and a grassy field sits between the runway and hangars. One row consists of "T-hangers," which have a T-shaped entrance for the wings of the planes. The hangars have access to a driveway that reaches the runway. The County owns the entire airpark, including the grounds and the structures, such as the hangars. (Meade Dep.; R. 113 at 47–49, 74; Page ID #1310.) The airpark is

6

open to the public, and people are on the premises all the time—the County has even authorized family-friendly events on the premises such as Easter egg hunts and soccer games.  (Stephens Dep.; R. 110 at 39, 104; Page ID #1162, 1178.)

The County has typically hired an entity with airport-related experience to manage the airpark itself—that entity is often referred to as the "fixed base operator" or "FBO."  This is because, as the County puts it, it "lack[s] the operational capacity and experience to manage an Airpark."  (County SJ Opp. to Attitude; R. 140 at 5; Page ID #2429.)  During relevant times here, Attitude Aviation was the operator for the airpark.  The agreement between the County and Attitude provided that the entire property was leased to Attitude.  (Attitude Lease; R. 129-2; Page ID #2218.)

The agreement made clear that maintaining safe conditions on the airpark premises was critical to both the County and Attitude.  Attitude agreed that it "shall maintain the premises in good order and *in a safe condition at all times*."  (*Id.*; Page ID #2219 (emphasis added).)  The agreement also stated that the County could take immediate possession of the premises from Attitude if the County had serious concerns regarding Attitude's "ability, interest, or intent to maintain said premises in compliance with the terms regarding public use and *public safety* as described by the Ohio Office of Aviation and or the Federal Aviation

7

Administration." (*Id.*; Page ID #2221 (emphasis added).) Attitude was also required to carry liability insurance providing at least $1 million in coverage. *Id.*

The County, however, did not hand exclusive authority of the premises to Attitude—there was much shared authority over the general premises and structures. The County's agreement with Attitude stated that any "construction of any permanent improvement or building," such as a hangar, would need approval of both the County and Attitude. (*Id.*; Page ID #2220.) Additionally, the County leased individual hangars for people to use to store their airplanes; Attitude was not a party to those leases. And these individual leases included a common provision to ensure that the County (as the property owner) had control over the hangar structures: If the person renting the hangars intended to make any "[p]hysical or structural improvements" to the hangar, those "*must be pre-approved*" by the County. (*See, e.g.*, T-hangar 12 Lease; R. 131-10; Page ID #2289 (emphasis added).) Attitude also sought some authority over the individual hangars, so an addendum to its agreement with the County made clear that the individual hangar leases would be negotiated with Attitude as well. (Attitude Lease; R. 129-2; Page ID #2223.) Thus, while Attitude managed the day-to-day operations and was responsible for keeping all of the premises "in a safe condition

at all times," (*id.*; Page ID #2219), the County also retained some joint control with Attitude over use of the premises and over hangar structures.

The County's interest in sharing authority with Attitude over the general premises and structures is particularly sensible in light of the fact that the County is required to ensure basic safety at the airpark to comply with the conditions of its receipt of federal funds for the airpark. The FAA provided the County approximately $150,000 in grant funds to improve the airpark grounds. The funds are conditioned on various contractual promises, known as "grant assurances" required by federal statute, 49 U.S.C. § 47107. If the recipient violates these assurances, it can lose the funding and is in violation of federal regulations. Here, for example, the County agreed that it would maintain basic safety, stating that it would "*operate and maintain in safe and serviceable condition* the Airport and *all facilities thereon* and connected therewith which are necessary to serve the aeronautical users of the Airport...." (Grant Agreement §19.a; R. 109 Ex.3 at 16; Page ID #1105 (emphases added).) The County further agreed that the airpark would be operated in a safe condition in accordance with minimum standards that may be required by applicable local, state, and federal agencies. (*Id.*) The FAA published an "Airports Compliance Handbook" in effect in 2008 that includes some of these minimum standards, including that the owner is generally required to

9

"carry out a continuing program of preventative maintenance," and that "*[a]ll structures should be checked frequently for deteriorations*." (FAA Handbook (FAA Order 5190.6A 10/1/1989); R. 107-4 §4-6a(1); Page ID #960 (emphasis added).) Thus, the County agreed that when it hired an operator such as Attitude, the County would "reserve sufficient rights and authority" to ensure that the airpark would be maintained and operated in compliance with the various obligations, including the obligation to maintain basic safety. (Grant Agreement §5.f.; R. 109 Ex. 3 at 13; Page ID #1102.)

As noted, while the County and Attitude share responsibility for the grounds and structures on the property, the County also leases its individual hangars to people who wish to store planes inside. Approximately 25 years ago, the County leased T-hangar 12 to a man named Cleo Watson for $75 per month. (Watson Dep.; R. 27 at 14; Page ID #97.) This T-hangar sat at the west end of the row. At that time, T-hangar 12 did not have doors. Watson was told to put doors on it, and he would then receive a discounted lifetime lease to store his plane there. (*Id.* at 15.) But, like the hangar itself, the doors would remain County property. (*Id.* at 16.) Of course, to cover the entrance where a plane would fit, these doors would have to be quite large—each approximately 20 feet wide. (*Id.* at 29; Page ID #100.) Watson gathered materials, and someone else installed the doors on the hangar.

10

Thus, T-hangar 12 now had two large doors made of aluminum sheets on a wood frame, with wheels at a railing on the top mounted on hanging tracks, allowing the doors to completely open to either side. (Schimizze Dep.; R. 131-1 at 9–12; Page ID #1592.)  Two steel pins at the bottom of each door (one inside and one outside) inserted into a hole cut into the concrete to secure them closed. (*Id.*) The doors also had locks mounted on hasps at the centerline. (*Id.*)  A smaller, standard-size entry door was mounted on the large hangar door to permit a person to enter without opening the large doors.

Fortunately, for years, the large hangar doors operated without major incident.  Neither the County nor Attitude ever inspected them to assess if they posed any sort of danger—not even possible danger to members of the public who were regularly on the premises.

By the summer of 2008, these large aluminum and wood doors were approximately 20 years old.  And to his credit, Cleo Watson—now almost 83 years old himself—was still making it to the airpark once in a while, as he had continued to lease T-hangar 12.  By this time, his rent was $100 per month.  The terms of his lease remained quite basic.  As noted, the County retained authority over any "[p]hysical or structural improvements" to the hangar—those "*must be pre-approved*" by the County.  (T-hangar 12 Lease; R. 131-10; Page ID #2289 (emphasis

11

added).)  And Watson was responsible for damages to the hangar.  There was no requirement that Watson obtain insurance—there certainly was no requirement to obtain liability insurance to cover catastrophic incidents in the main grounds of the airpark caused by the exterior structure of the hangar.

Also to Watson's credit, when he managed to get to the airpark and saw that something was not right with the hangar, he would make some efforts to resolve it. For example, he noticed that when the wind would pick up, it was starting to blow the end of the hangar door up.  (Watson Dep.; R. 27 at 26; Page ID #100.)  Watson managed to tie a rope around the door as a makeshift fix to keep it from being blown by the wind.  (*Id.*)  And, in June 2008, when someone pried the screws out of the hasps holding the locks on the doors in an effort to break into the hangar, Watson reported the incident to the County Sheriff, and both the County and Attitude learned of the issue.  (Watson Dep.; R. 27 at 7–9; Page ID #95.  County Incident Report; R. 138-2; Page ID # 2397.)  Watson knew that he was not the only one responsible for these doors—indeed, unlike Attitude, Watson of course had no obligation to even show up at the airpark on a regular basis, let alone to be present every day.  Thus, when asked who maintained the hangar doors, Watson replied, "Me and Attitude Aviation."  (Watson Dep.; R. 27 at 16; Page ID #97.)

12

But the County and Attitude had still never inspected these old hangar doors. Over 20 years, the doors had literally weathered a number of serious thunderstorms (26 storms in the previous decade, as the County has pointed out (*see* County SJ Opp.; R. 132 at 6; Page ID #2314)), and yet the doors were still hanging on—with the help of the rope Watson had managed to fasten on. But they were not going to make it much longer—not only was the wood frame deteriorating, but the doors were also missing a bracket that would keep them from moving when the wind picked up. (Kohn Dep.; R. 118 at 57; Page ID #1564 (expert witness: "Had there been a proper bracket, it probably would have kept the door intact in that corner enough to resist the load.").) Because the County and Attitude chose to never maintain or inspect the doors, they simply gambled that the next strong winds at the airpark would not create a problem—let alone a disaster if the doors were launched onto the public grounds.

Meanwhile, on the other side of this row of hangars over at T-hangar 9, Larry LeMaster was operating his skydiving business, Tri-State Skydivers. Ashley Washburn had been skydiving with LeMaster's company for the past two years. (Washburn Dep.; R. 116 at 87; Page ID #1422.) She regularly went to the airpark on the weekends either to skydive or, if she didn't feel like jumping, to socialize with LeMaster and other skydiver friends there. LeMaster often set up canopy-

13

style tents outside of his hangar on the airpark grounds where his customers, staff, and visitors could socialize, wait for a turn to jump, or have a picnic.  Washburn became friends with LeMaster, and sometimes she helped out with Tri-State's business in exchange for free jumps.  (*Id.* at 105–09; Page ID #1427–28.)

Then came the fateful afternoon of Sunday, July 20, 2008.  Cleo Watson did not come to the airpark that day, so the old hangar doors over at T-hangar 12 were closed.  Ashley Washburn, however, went to the airpark to join some friends and watch some jumps with LeMaster's group.  She decided not to jump herself that day.  LeMaster had gone up for a jump, and the winds started picking up, as often occurs on open grounds such as airparks.  LeMaster noted that the conditions were "similar to those [he] had observed and experienced on many occasions." (LeMaster Aff.; R. 103-1 ¶4; Page ID #877.)  A summer thunderstorm was moving in, and LeMaster decided to land at another airpark.  Meanwhile, Washburn helped others to begin taking down the tents, preventing them from being damaged (or from injuring others) due to the wind.  (Henry Dep.; R. 122 at 32–36; Page ID #1747–48.)

This is when the wide doors on T-hangar 12 finally gave way.  The wind pulled the corner of one door up until it split and broke off of the hangar—the aluminum surface of this 150 to 200 pound piece lifted it into the air like the wing

14

of a plane. This flying frame shot over the hangar row and flew into Washburn's head and upper body, smashing numerous bones in her face and torso. (*See generally*, Kohn Dep.; R. 118 at 33–40; Page ID #1558–59.) Other than these doors on T-hangar 12, there was no other structural damage at the airpark or surrounding community that day. (LeMaster Aff.; R. 103-1 ¶6; Page ID #877.) No other hangar doors were affected. Not even the electricity went out at the airpark. (*Id.* ¶7.)

Washburn survived, but she will never be the same. The impact smashed the bones in her face so that she now has many titanium screws holding various titanium plates that keep her face together. She also suffered traumatic brain injury, leaving her with mental problems that will plague her for life. The County and Attitude agree that she has suffered massive injuries. (*See also* Hospital Discharge; R. 73-2; Page ID #557 (noting "brain contusion," "facial fractures," "skull fracture," "rib fractures," "splenic laceration," etc.).)

Washburn brought this action against the County and Attitude in the district court, contending that they were negligent with regard to these injuries that their hangar door had caused her while she was in their airpark. The district court agreed with the County and Attitude that, as a matter of law, they had no liability whatsoever, so they were granted summary judgment. Washburn's case was dismissed, leaving her with no remedy. She timely appealed.

15

## SUMMARY OF ARGUMENT

Ashley Washburn was struck by an exterior hangar door on public airpark grounds, yet the district court concluded—as a matter of law—that the County (which owned the airpark) and Attitude Aviation (which ran the airpark) could not be liable.  This conclusion rested on the three legal issues presented in this appeal: Existence of duty, extent of duty, and breach of duty.  For each, the district court made a fundamental analytical mistake, leading to a decision that is simply wrong.

*First*, the County and Attitude owed a duty to Washburn while she was on the airpark grounds because they had control over the grounds and the exterior hangar door.  The district court's mistake here was to analyze the situation and case law as if she were *inside* a leased space (such as the hangar) and injured by something inside.  Cases uniformly establish that control (and therefore duty) exists when, as here, a plaintiff is injured on the premises outside of the leased space by an exterior part of a leased space.

*Second*, the duty owed to Washburn as she visited her friends and Tri-State Skydiving at the airpark was one of ordinary care.  A duty of ordinary care is owed to "invitees" (where there is some benefit to the landowner); mere "licensees" are subject to a lesser standard.  The district court's mistake here was failing to adequately recognize that this Court's 2012 decision in *Andler v. Clear Channel*

16

controlled, as it recited current Ohio premises law and involved a nearly identical scenario in holding that a visitor to a campground was an invitee.

*Third*, the breach of this duty of ordinary care is obvious here: The County and Attitude admit that they never did any inspections or maintenance of the exterior hangar doors. The district court's mistake was to buy their argument that, because they "lacked notice" of any problems with the doors, they could not be liable. The court failed to see that they created their own lack of notice by choosing not to inspect the doors. Lack of notice is a defense to negligence only if one is *already exercising ordinary care* by conducting proper inspections. (An owner of dangerous property can't walk through it with a blindfold on and then claim lack of notice of the dangers, thus escaping liability for injuries to those on the property.)

Basic tort law establishes that these issues were improperly resolved and that the decision below is wrong. This Court should reverse and remand for trial.

17

## ARGUMENT

The district court committed reversible error when it granted summary judgment to the County and Attitude, mistakenly concluding as a matter of law that a jury could not find that they at least shared in some responsibility for Washburn's tragic injuries.

The district court's decision is reviewed de novo—this Court takes a fresh look from a clean slate. *Davet v. City of Cleveland*, 456 F.3d 549, 552 (6th Cir. 2006) ("We give fresh review to the district court's summary-judgment decisions…."). In doing so, this Court must view the evidence and reasonable inferences in the light most favorable to Washburn. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 n.2 (1986). If that fresh review of the evidence shows that a jury could find in her favor on the elements of her claim, then summary judgment was improper and this Court should reverse so that her case can proceed to trial. *Id.* at 248.

The elements of a negligence claim are well known. Washburn must show (1) Defendants owed her a duty (and what the extent of that duty is, such as ordinary care); (2) Defendants breached that duty; (3) Defendants were a proximate cause of her injury; and (4) she sustained damages. *See Loudin v. Radiology & Imaging Servs.*, 948 N.E.2d 944, 949 (Ohio 2011). (The parties agree

18

that this diversity case is governed by Ohio's substantive law; it is home to the incident, the forum, and the Defendants.)

The district court granted summary judgment to Defendants on three grounds: (1) they owed no duty to Washburn; (2) even if they owed a duty, it was only to avoid wanton or willful disregard for her safety (not to exercise ordinary care); (3) even if they owed a duty of ordinary care, they did not breach that duty.[1]

As shown below, the district court simply made elementary errors in the analysis on all three points. In sum, (1) Defendants owed a duty to Washburn as she stood on the airpark grounds; (2) that duty was one of ordinary care because she was an invitee; (3) they breached that duty by admittedly failing to do any routine maintenance or inspections.

---

[1] Defendants raised two defenses not accepted by the district court. *First*, they claimed that the "Act of God" defense insulated them from liability entirely, but that defense applies only where it can be shown as a matter of law that natural events are the *sole* cause of the injury. That is not the case here (even the County concedes that there is "an issue of fact as to whether any maintenance on the door was needed," (County SJ Opp.; R. 132 at 20; Page ID #2328)), and the district court did not rule on this defense. *Second*, Defendants claimed that Ohio's recreational-user statute insulated them from liability, but that statute—which applies to lands opened up for recreational uses such as hunting and fishing—has never applied to airports, and the district court properly rejected the effort to apply it to the airport here. (SJ Op.; R. 153 at 39–40; Page ID #2643.)

I.   **DUTY EXISTS:  The County and Attitude Owed a Duty to Washburn Because They Had Control Over the Exterior Hangar Door that Struck Her on the Airpark Grounds.**

Who owes a duty to protect a person when that person is injured by an alleged defect or dangerous condition on the premises?  The basic answer is sensible:  A duty is owed by those who had some control over the portion of the premises that is dangerous.  The idea is that those in control are in the best position to protect people, such as innocent bystanders and guests, on or near the property.  When there is a single landowner with control of the premises, the analysis is simple—that landowner owes a duty to others on or near the premises.  But, of course, the landowner may also have leased the premises to a tenant (or divided it among various tenants).  And the landowner may have hired another entity to manage the property.  The basic rule answers these scenarios as well:  Those parties that had some control over that portion of the premises causing the injury owe a duty.  Often, there is joint control.  If so, those parties can be jointly liable to the injured party.  Those parties can then seek to apportion liability amongst themselves based on their arguments about who shares greater blame for the defective portion of the premises.  Section A below provides the applicable case law regarding the proper analysis for assessing control with respect to leased premises;

20

section B shows that, under that case law, both the County and Attitude had such control here over the exterior hangar door at T-hangar 12.

### A.   Premises liability involving leased space turns on the control over the portion of the premises that is hazardous.

Two types of cases arise when a person is injured by a defective portion of premises involving a lease:  Either (1) the defective portion of the premises is *inside* the leased space (e.g., a cabinet inside the leased space falls on someone); or (2) the defective portion of the premises is part of the *exterior* structure separating the leased portion from the main grounds or public walkways (e.g., an entry door to the leased space falls on someone outside).  In the first scenario, it might not be fair to hold the landowner or property manager responsible, because they might lack control over what goes on inside the leased space.  But in the second scenario, where the defective portion of the premises is part of the exterior structure itself and injures someone on the grounds of the general property, the landowner or property manager almost always has at least some control (even if it is joint with the tenant) and therefore a duty to ensure minimal safety.  A brief discussion of the relevant case law—including the cases relied upon by the district court and Defendants here—illustrates how these principles operate.

### 1. A defect **inside** the leased space might not involve owner/operator control.

As noted, when a hazardous condition inside a leased space injures someone who is also inside that leased space, the owner or operator of the greater property is often not liable because they tend to lack any control over the situation. This is what occurred in a number of the cases relied on by Defendants and the district court here. *See Hendrix v. Eighth and Walnut Corp.*, 438 N.E.2d 1149 (Ohio 1982) (holding that owner of parking garage did not have any control over faulty car elevator that injured plaintiff inside the leased space); *Monahan v. Duke Realty*, 2008 Ohio 1113 (Ohio Ct. App. 2008) (holding that owner of building did not have control over cabinet that fell and injured plaintiff inside the leased space).

Sometimes, however, the owner or property manager has some control over the inside of the leased space, and therefore will owe a duty to the plaintiff. That was true in *Brown v. Cleveland Baseball Co.*, 106 N.E.2d 632 (Ohio 1952), which was also relied on by the district court and provides useful principles for assessing a landowner's duty. There, the owner of a stadium leased for a game was liable to a plaintiff injured inside when the stands collapsed, because the owner retained control inside, including having its own employees work at the game. *Id.* at 634. The court invoked an oft-cited rule for assessing control and duty under these conditions, noting that "one must ordinarily have or exercise the power and the

22

*right to admit* such individuals to the premises or *to exclude them* from the premises." *Id.* (emphases added). The court held that the owner was liable because he had some control over "the portion of the premises *on which plaintiff was* when injured." *Id.* (emphasis added).

Thus, in sum, a landowner generally does not have a duty to a person injured inside of a leased space by a hazardous condition inside, unless there is evidence that the landowner had some control inside—where the plaintiff was injured.

> 2.    *A defect on the **exterior** of a leased space will involve some owner/operator control.*

The question in this case is not about liability for a defective condition and injury inside a leased space. The question is about liability for a defective condition on the exterior wall of a leased space that injures a person outside. That is a very different question, because courts uniformly recognize that the landowner or property manager typically has at least some control in that context. Those are the determinative decisions here.

Indeed, the Supreme Court of Ohio has reached this conclusion. *See Friedl v. Lackman*, 23 N.E.2d 950 (Ohio 1939). There, the owner of a building had leased the entire building to a tenant. A cord supporting the upper part of an exterior window had worn down to the point that it snapped, causing the upper part of the window (known as the sash) to drop to the window sill, breaking the glass. The

23

plaintiff was on the sidewalk below, and falling shards of glass struck him in the head. The plaintiff obtained a jury verdict against the owner, and the Supreme Court of Ohio concluded that the owner was indeed liable. The court began with the starting proposition that the owner of a structure generally owes a duty to those nearby and therefore must ensure that "the outside of the building" is properly maintained so that it is not a danger. *Id.* at 951. The question was whether anything, such as the terms of the lease, altered that basic duty. The court noted that the lease provided that the owner was to keep the outside of the building in good repair, and that the lessee was to make all inside repairs. Despite that the glass was considered inside under the lease, the court explained that the other parts of the window, such as the sash and the worn-down cord, must be considered as outside. *Id.* Thus, the court concluded, the owner's duty to ensure minimal maintenance "remained the same as before the execution of the lease." *Id.* The court emphasized that an *exterior part* of the structure had failed: "With respect to the window sash that fell, the situation was no different than if a part of the roof or wall had given way." *Id.* Moreover, the court stated that it was irrelevant whether the owner had knowledge of the defective condition: "The fact that the owner had no knowledge of its dangerous condition does not relieve him from liability to the

24

pedestrian on the sidewalk any more than would lack of knowledge of the dangerous condition of any other part of the outside of the building." *Id.*

Other courts consistently reach the same conclusion when an exterior part of the building is defective and injures someone nearby, even though that part of the building was also part of a leased space. *See, e.g.*, *Munger v. Union Savings & Loan Assoc.*, 27 P.2d 709 (Wash. 1933) (defendant leased two floors of a building to lessee; lessee constructed and suspended a 3-foot by 5-foot sign on a wood frame on exterior wall to leased space; gust of wind blew sign and injured plaintiff on sidewalk below; court emphasized that lease provided that any signs "must have the *approval*" of the defendant; court also notes that this "is not a case of one being injured *on the premises* to which a lessor has given up full control and possession to a tenant…but it is one in which a person is injured…by the falling of an object negligently placed *on the wall* of a building adjoining the sidewalk") (emphases added); *Both v. Harband*, 331 P.2d 140 (Cal. Ct. App. 1958) (owner liable when piece of exterior of leased building fell onto person outside; owners made no inspections of building; question of fact remained regarding whether tenant also had control of space).

The duty of such owners and lessors in these contexts is even more apparent when the plaintiff is not simply injured near the property on a public walkway, but

25

*on the general property itself.*  The Supreme Court of Arizona reached this conclusion in a case involving similar circumstances to those here.  *See Siddons v. Business Props. Dev. Co.*, 953 P.2d 902 (Ariz. 1998).  In *Siddons*, the plaintiff was injured when, as with Washburn, an exterior door to a leased space fell on him.  The leased space was a store in a strip mall, and employees of the store had removed the door from its hinges and propped it on the sidewalk so that they could get large appliances into the store.  *Id.* at 902.  The plaintiff sued both the store and the owner of the mall.  The trial court granted the owner's motion for summary judgment, and the court of appeals affirmed, concluding that the owner had no duty to protect the plaintiff against the hazardous positioning of the door.  *Id.* at 903.  The Supreme Court of Arizona reversed, holding that there was evidence that the owner also had some control over the door.  The court noted that the owner retained control over common areas outside the leased space and that its lease required pre-approval over any changes to the interior or exterior of the leased premises.  *Id.*  Thus, the court explained, this gave rise to factual issues regarding the owner's control such that summary judgment was improper.  *Id.*  The case was remanded for a trial.  *Id.*

*Siddons* was followed just last year in another case where a person was injured on the grounds of the main property by an exterior wall to a leased space.

*See Liebowitz v. U.S. Office Holdings, L.P.*, No. 10-636, 2011 Ariz. App. Unpub. LEXIS 757 (Ariz. Ct. App. May 31, 2011) (reversing grant of summary judgment to building owner where plaintiff walked into allegedly defective glass exterior wall of a leased office in the building, holding that a finder of fact could conclude that the owner had some control over the glass wall, as it bordered the common area).

In sum, the owner or lessor generally has control and authority over the exterior of leased spaces, such that there is a duty to those nearby who could be injured by an exterior part of the structure (as in *Friedl* and *Munger*).  That duty is particularly apparent where the plaintiff is injured by that exterior structure not just while on a public walkway but while on the greater premises (as in *Siddons* and *Liebowitz*).  Also, significant evidence of the control over an exterior structure are lease provisions that require owner/lessor approval over changes to it.  Finally, when the plaintiff is injured *outside* of the leased space by such an exterior structure, courts do not ask whether the owner could "admit or exclude" people from the *inside*—that inquiry is useful only when the person is injured inside (such as in *Hendrix*, *Monahan*, and *Brown*).  Indeed, to the extent the question of whether the owner had authority to "admit or exclude" people is applicable, the proper portion of the premises to consider is not the leased space; it is the area where the plaintiff was when injured.  *See Brown*, 106 N.E.2d at 636 (holding owner liable

27

where it had authority to admit people to and exclude people from "the portion of the premises on which plaintiff was when injured").

All of these decisions and principles are consistent with the Supreme Court of Ohio's decision in *Fryberger v. Lake Cable Recreation Association, Inc.*, which also was relied on by the district court and further explains the principles of joint control in the premises-liability context under Ohio law. 533 N.E.2d 738 (Ohio 1988). In *Fryberger*, the plaintiff was at his lawyer's lakefront home to discuss a legal matter and later asked if he could go for a swim in the lake. The lawyer gave permission, and the plaintiff walked onto the lawyer's dock and then dove into the water. The water was much shallower than the plaintiff expected and he suffered serious injuries striking his head on the bottom of the lake. He brought suit against the owners of the lake, contending that they were negligent in various ways, including failing to post signs warning of the shallowness of the water and failing to maintain sufficient water depth. The owners countered that they owed no duty to the plaintiff because they did not own the dock and had no control over who was invited by any of the individuals living at the lake. *Id.* at 351. The owners also relied in particular on the rule from cases such as *Brown* that ordinarily control "implies the power and the right to admit people to the premises and to exclude people from it . . . ." *Id.* The Supreme Court of Ohio rejected these points, stating

28

that the right to admit or exclude "can be shared by more than one defendant" and that "the right to admit or exclude" is not "the only indicium of control." *Id.* at 741. Noting that there were several facts indicating that the lake owners had at least some control—e.g., maintaining a swimming area around the lake, some ability to admit and exclude *from the lake itself*, control over the water level and lake management—the court concluded that the owners were not entitled to summary judgment. *Id.* at 742.

Indeed, *Fryberger* fits perfectly with the cases in the leasing context if one assumes that the lake owners also owned the lakefront home and dock, and had leased that home and dock to the lawyer. The plaintiff was not injured inside the leased space exclusively under the lawyer's control; instead, the plaintiff was injured in the general premises (the water) adjoining the leased space. Because the lake owners had some control over that common area *where the plaintiff was injured* (and thus could have taken steps to eliminate the hazard), they were not entitled to summary judgment.

Before applying these principles to this case, one point bears emphasis in this summary-judgment context: The question of duty—though ultimately a legal question—turns on the factual question of whether the landowner (or property manager) had some control over the situation that caused the injury. And, because

29

the owner typically has control where an exterior structure causes injury in the general premises, it is almost always error to grant summary judgment to that owner. More likely, summary judgment is appropriate for the plaintiff on the question. At the very least, the facts on control should go to the jury. *See, e.g.*, *Liebowitz*, 2011 Ariz. App. Unpub. LEXIS 757, at *3 ("Because a disputed issue of fact exists as to whether [the owner] or [the tenant] controlled the glass wall, a factfinder must resolve this question before a court can rule on duty."); *see also Fryberger*, 533 N.E.2d at 742 ("[A] genuine issue exists as to whether the [owners] had sufficient control of the premises to impose a duty to [the plaintiff].").

Thus, if the evidence indicates that a jury could conclude that the County or Attitude had even some joint control over the exterior hangar door, the district court erred in concluding that these Defendants owed absolutely no duty as a matter of law.

### B.     Both Defendants had control over the exterior hangar door that struck Washburn on the airpark grounds.

As with every case discussed above regarding an owner's liability for an exterior part of a leased space, Defendants here had control over the exterior hangar door that injured Washburn while she was on the airpark grounds.

The physical arrangement of the defective exterior portion of the leased hangar at the airpark is like those in *Friedl*, *Munger*, *Siddons*, and *Liebowitz*.

30

Consider *Siddons* and *Liebowitz* in particular, where the plaintiff was injured while on the greater property itself (not simply a public walkway). Just as here, the leased space is inside the greater property, and the defective exterior adjoins the general property, which is exactly where the plaintiff was injured. Indeed, *Siddons* involved a leased store inside of a strip mall, and the County has previously stated that the situation here "is analogous to a situation where a company owns a shopping mall, leases the entire property to a property manager to conduct the day to day operations of the facility, and leases individual stores to retail establishments." (County SJ Opp. to Attitude; R. 140 at 4; Page ID #2428.)

The County makes this point so that it can say that, even if there was owner/operator control over the exterior hangar door and the general airpark property, such control actually belonged to *Attitude*, which ran the airpark and agreed to ensure the premises were safe. Attitude, not surprisingly, emphasizes the County's authority over the general property and its individual hangars—such as the provision that it must "pre-approve" structural changes to hangars—to show that such control actually belonged to *the County*. As shown below, they are both correct—they both had control.

31

### 1. *The County had control over the exterior hangar door.*

The County, like the owners in *Siddons* and *Liebowitz*, has authority over the airpark, its common areas, and structures.  The County did not simply step aside to let Attitude control everything—indeed, the County controlled all leases at the airpark and did not allow Attitude to simply sublet portions of the property.  Thus, for example, the County authorized everything from Easter egg hunts to soccer games to occur at the airpark.  (Stephens Dep.; R. 110 at 39, 104; Page ID #1162, 1178.)  And when LeMaster wanted to build a storage shed, he asked Attitude for permission, and Attitude in turn asked the County.  (LeMaster Dep.; R. 117 at 109–10; Page ID #1515.)  And when he sought to use parts of the grounds not within his lease, it was the County (through its prosecutor) that wrote a letter explaining this was not permitted.  (Stephens Dep.; R. 110 Ex. 20; Page ID #1211.)  As Attitude explained in the district court, the County cannot "pretend as if it is truly an absent-minded landowner who knows nothing that occurs at the Airpark." (Attitude SJ Opp. to County; R. 141 at 2; Page ID #2444.)

Moreover, under the T-hangar lease, the County had to approve any structural changes to the T-hangars: "Physical or *structural* improvements may be made by the LESSEE [Watson] during the term of this lease, but any such improvements *must be pre-approved* by LESSOR [the County]."  (T-hangar 12

32

Lease; R. 131-10; Page ID #2289 (emphasis added)).  This shows County control. *See Friedl*, 23 N.E.2d at 951 (finding control over sign on exterior area of leased premises blown into plaintiff by wind where lease provision required pre-approval of exterior signs on building); *Siddons*, 953 P.2d at 903 (finding control over exterior door to leased area that fell onto plaintiff where lease provision required pre-approval of changes to exterior structure); *see also Stackhouse v. Close*, 94 N.E.2d 746, 747 (Ohio 1911) (owner had partial control over structural changes where lease required any such changes to occur under supervision and direction of owner's architect).

These basic—and undisputed—facts alone establish that the County had control over the exterior hangar door.  But there is more.

There is a logical reason why the County has retained such control:  The County is obligated to the federal government to maintain sufficient control.  If the County entirely gave up such control over facilities on the property, it would be in violation of its federal grant agreements with the Federal Aviation Administration. The grant assurances required the County to "maintain in *safe* and serviceable condition *all facilities*…" (Grant Agreement ¶19.a; R. 109 Ex.3 at 16; Page ID #1105 (emphases added).)  The County, as the owner of an airpark that receives

33

federal funds and is available to the public, is "[m]ore than a passive landlord…" (FAA Handbook; R. 107-4 §4-7.a; Page ID #961.)

A short aside on these grant assurances: To be very clear—contrary to what Defendants have suggested repeatedly in the district court—Washburn does not argue that these grant agreements somehow provide a cause of action for her. She also does not contend that every violation of a grant agreement automatically establishes a breach of a duty owed to her. But the agreements are contractual obligations that the County has entered with the FAA—including obligations to maintain control to keep the facilities in safe condition. And, as obligations to maintain control, they are good evidence that the County actually wants to have, and does have, control. *See Chilcutt v. Ford Motor Co.*, 662 F. Supp. 2d 967, 973 (S.D. Ohio 2009) (holding that violations of OSHA regulations do not require a conclusion that a duty exists but they can serve as evidence that such a duty exists and that it was breached); *see also Lang v. Holly Hill Motel, Inc.*, 909 N.E.2d 120, 125 (Ohio 2009) (noting that violation of building-code violations may serve as "strong evidence" that the condition at issue was dangerous and that the landowner breached the attendant duty of care by not rectifying the problem).

Yet, despite all this, the County's position is that exclusive control over the T-hangar's exterior—and therefore any duty to Washburn as she was injured on

34

the airpark grounds—was entirely in the hands of Cleo Watson, the elderly local man who stored a plane inside the hangar for $100 per month, did not have to be present at the airpark, was not present when Washburn was injured, and does not have to carry any liability insurance for injuries that arise from the structure itself. That position is contrary to basic tort law (and basic safety).

Simply put, the County retained possession in and had control over the exterior hangar doors on its airpark grounds. At the very least, a jury could find that to be the case. Thus the district court erred when it held, as a matter of law, that the County had no control whatsoever and therefore no duty.

But how did the district court make this error? The district court's mistake was to treat this situation as if Washburn were injured by something defective *inside* of T-hangar 12, so that it would just be a run-of-the-mill case where only the tenant (Cleo Watson) had exclusive control. In that way, the district court viewed this case as analogous to the cases such as *Monahan* and *Hendrix*, and that the led the court to focus on control over the hangar generally, instead of control over the exterior hangar door itself and the fact that Washburn was injured *outside* on the airpark grounds. The district court put it this way: "As *Fryberger* and *Brown* illustrate, the critical issue is whether both entities exercised possession and control of *Watson's hangar*. . . ." (SJ Op.; R. 153 at 23; Page ID #2627 (district court's

35

emphasis).) Thus, the court was also improperly focused on the "right to admit or exclude others" from the leased space instead of the grounds where Washburn was injured: "[T]he *critical question*," the district court stated, "is whether Attitude had the power to admit or exclude others *from Watson's hangar*, and whether it actually exercised that power." (*Id.* at 19; Page ID #2623 (emphasis added).) That focus is simply wrong when the defect is an exterior part the leased space and the person is injured on the main grounds. The decision directly conflicts with *Friedl*, *Munger*, *Siddons*, and *Liebowitz*, where the owners/lessors had a duty but lacked control of the inside of the leased space at issue. It also conflicts with the consistent principles in *Fryberger*. Washburn didn't have a cabinet fall on her inside T-hangar 12; she had a piece of the T-hangar exterior strike her while she was on the airpark grounds. The County had control and therefore a duty.

## 2. Attitude also had control over the exterior hangar door.

Like the County, Attitude also had control over general airpark premises—but its role was the day-to-day manager. Indeed, the County leased the entire airpark to Attitude. And Attitude's lease specifically required it to "maintain the premises in good order and *in a safe condition at all times*." (Attitude Lease; R.129-2; Page ID #2219 (emphasis added).)

36

Moreover, Attitude had authority over the leased hangars as well.  As the County has described its agreement with Attitude, Attitude has "managerial authority" over the hangars: "The hangars are subject to two leases—the individual leases between Lawrence County and the individual pilots and the FBO Lease which delegates *managerial authority* over the Airpark, *including the hangars*, to Attitude Aviation."  (County SJ Opp. to Attitude; R. 140 at 4; Page ID #2428 (emphasis added).)  "[T]here is no basis for Attitude Aviation to claim that the T-hangars that are clearly located at the Airpark are not part of the leased property over which they assumed managerial obligations."  (*Id.* at 5; Page ID #2429.)  And recall Watson's response when asked who maintained the hangar doors:  "Me and Attitude Aviation."  (Watson Dep.; R. 27 at 16; Page ID #97.)

Thus, this situation is analogous to *Friedl*, *Munger*, *Siddons*, and *Liebowitz* if the property owners/lessors in those cases had, like the County here, retained control but also hired another entity to manage the property and required that entity to "maintain the property in safe condition."  Consider the shopping-mall scenario in *Siddons*, for example.  If the mall owner had hired a property manager to have responsibility over the common area and keep that area minimally safe, that property manager would have had some control over the hazardous exterior store door that fell on the plaintiff in the common area.  Attitude is in precisely the same

position as that property manager. Indeed, as noted, Attitude agreed to indemnify the County for injuries taking place. This indicates Attitude at least shares in control over injuries in the general areas of the airpark under its control.

Yet, despite all this, Attitude echoes the County's "aw shucks" approach, recognizing the tragedy of Washburn's injury but also wiping its hands of any responsibility, similarly suggesting that Cleo Watson—who wasn't even there— was the lone keeper of Ashley Washburn's safety as she was on the grounds of the airpark that Attitude ran every day.

In short, Attitude also had control here, and it owed a duty to Washburn.

## II.   EXTENT OF DUTY:  The County And Attitude Owed Washburn a Duty of Ordinary Care Because She Was an Invitee.

With the duty of both the County and Attitude to Washburn established, the next question is to determine the extent of that duty.

As this Court has recently explained, a landowner's duty under Ohio premises-liability law depends on whether the person on the land is an invitee or is instead merely a licensee or trespasser. *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 723 (6th Cir. 2012). An invitee is someone who enters another's property "by invitation, express or implied, for some purpose [that] is beneficial to the owner." *Id.* A licensee, by contrast, enters for his or her "own pleasure or

benefit, and not by invitation." *Id.* A person is an invitee when the person provides some "economic (or tangible) benefit" to the owner. *Id.*

If the person is an invitee, a basic negligence standard applies: The owner has a duty to exercise ordinary care by maintaining the premises in a safe condition. *Id.* (citing *Provencher v. Ohio Dep't of Transp.*, 551 N.E.2d 1257, 1258 (Ohio 1990)). If the person is a licensee, the owner has more leeway and need only refrain from "wantonly or willfully causing injury" and is not liable for mere negligence. *Id.*

A person may also be a visitor to someone else on the property—if allowing such visitors benefits the owner, that visitor is also an invitee and is owed a duty of ordinary care. For example, visitors of paying hotel guests are invitees. *Id.* (citing various Ohio cases). This is because the hotel owner "benefits both directly and indirectly from accommodating its paying guests in that respect." *Id.* (quoting *Ray v. Ramada Inn N.*, 869 N.E.2d 95, 103 (Ohio Ct. App. 2007)). The same is true of a visitor to a patient in a hospital. *See Bowins v. Euclid General Hosp.*, 484 N.E.2d 203, 205 (Ohio Ct. App. 1984) (explaining that hospitals expect patients to have visitors and, thus, it was part of their business). By contrast, where a person's presence does not benefit the owner in any tangible way, the person is merely a licensee. *See, e.g.*, *Provencher*, 551 N.E.2d 1257 (rest stop); *Souther v. Preble Cnty. Dist. Library*, 2006 Ohio 1893 (Ohio Ct. App. 2006) (library).

The *Andler* court explained that these principles are consistent with the Supreme Court of Ohio's holding in the context of residential leases that a landlord owes the same duty of care to social guests of a tenant as to the tenant himself. *Andler*, 670 F.3d at 723 (discussing *Shump v. First Continental–Robinwood Assocs.*, 644 N.E.2d 291, 296 (Ohio 1994)). In *Shump*, the court rejected efforts by landlords to limit their duty to guests of tenants based on the argument that the guest might be an invitee of the tenant but remained merely a licensee of the landlord. 644 N.E.2d at 296. As will be shown, the *Andler* decision—involving similar facts to this case—confirms Washburn's status as an invitee.

In *Andler*, the plaintiff and her boyfriend attended a country music festival. A broadcasting company owned and operated a nearby campground as part of the festival. *Id.* at 721. The plaintiff and her boyfriend were not staying at the campground, but in the evening they visited friends who were staying there. *Id.* That night, they left their friends and walked around the grounds, first stopping to listen to some campers play music and then on toward the restrooms. *Id.* On the way to the restrooms, the plaintiff stepped off the path she was on and fell into a grass-covered hole, breaking bones in her feet. *Id.* She brought suit against the company that owned the campground, seeking compensation for her injuries. *Id.* The company contended that the plaintiff was a mere licensee, but the district

40

court rejected that argument, concluding that she was an invitee entitled to ordinary care. *Id.* at 722.

This Court agreed that she was an invitee. After discussing current Ohio premises law as noted above, the Court explained that the plaintiff was an invitee even though she was not a paying guest of the campsite itself, because she was visiting her friends who had paid to camp and "thus provided an economic benefit" to the owner of the campground. *Id.* at 724. "Like a hotel," the Court explained, "a campground benefits by accommodating its paying guests' desires to have visitors." *Id.* Moreover, the Court noted, "A campground that discourages visitors by declining to exercise ordinary care for their safety may lose paying guests." *Id.* In sum, the owner "received some economic benefit from [the plaintiff's] presence at its campground . . . ." *Id.* "The benefit may have been somewhat indirect," the Court acknowledged, "but it was not intangible." *Id.* (distinguishing *Provencher*, 551 N.E.2d 1258, which rejected invitee status for a rest-stop visitor because the benefit of increased highway safety achieved by rest stops was an intangible benefit). Finally, the Court rejected the owner's argument that the plaintiff lost her invitee status when she left to listen to music and then walk to the restroom. *Id.* The Court explained that part of the festival experience is meeting fellow attendees, which could include visiting other campers, and that

41

going to the restroom could not be a sufficient deviation to divest her of invitee status. *Id.* Nor did she leave an area designated for invitees. *Id.*

Just as the plaintiff in *Andler* was an invitee owed an ordinary duty of care, so too was Washburn when she visited LeMaster and Tri-State Skydiving at the airpark. Both the County and Attitude benefit from having the various individuals and businesses, such as LeMaster and Tri-State, invite guests onto the property. Those individuals and businesses pay rent to the County, which in turn remits that money to Attitude. As Attitude itself has previously stated: "[T]he County remitted to Attitude the rent from the T-hangar leases to offset some of the airport expenses." (Attitude SJ Mem.; R.128 at 7; Page ID #2190.) Attitude has also acknowledged that such visitors were expected and common: "As was usual, Tri-State would invite the public to participate in skydiving activities." (*Id.* at 2; Page ID #2185.) Indeed, Washburn provided an even more direct benefit than the plaintiff in *Andler* as Washburn paid to skydive and often performed work for Tri-State in exchange for jumps. (LeMaster Dep.; R. 117 at 49–50; Page ID #1500.) Thus, Washburn was an invitee, and she was owed a duty of ordinary care for her basic safety on the airpark grounds.

The district court failed to properly recognize this Court's decision in *Andler*, which controls and provides the greatest factual similarity to Washburn's

42

situation.  *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (explaining that this Court's decisions interpreting state law are generally binding on district courts in this circuit and on subsequent panels of this Court). Accordingly, the district court believed this case was simply like those such as *Provencher*, and *Souther*, where no tangible benefit flowed to the owners.  (SJ Op.; R. 153 at 34; Page ID #2638.)  Under *Andler*, this was mistaken.  Thus, the conclusion this Court should reach is unremarkable:  When Ashley Washburn visited the public airpark owned by the County and managed by Attitude, they owed her a duty of ordinary care to ensure that she was minimally safe while there.

## III.    BREACH:  A Jury Could Conclude That Both Defendants Breached Their Duty of Ordinary Care Because They Never Inspected The Hangar Door to See If It Was Defective And Dangerous.

Having established the duty that the County and Attitude owed to Washburn, the next question is whether there is evidence that they breached that duty.  In particular, did they breach their duty of ordinary care to ensure there were not dangerous conditions on the premises?

The analysis here is quite simple:  The County and Attitude breached their duty to ensure minimal safety because they both concede that they did no maintenance or inspections whatsoever—let alone any on the 20-year-old hangar doors on T-hangar 12:

43

- County Testimony (through its representative):

  Q.   Specifically there's never been an inspection, you can tell me about, in the last 20 years of the structures at the Lawrence County Airport?

  A.   There's none to my knowledge.

(Meade Dep.; R. 113 at 45; Page ID #1314.)

- Attitude Testimony (through its President):

  Q.   … But, other than inside those Attitude Aviation hangars, you've never done any maintenance on any other hangars or on the structures, the building, the outside of the hangars?

  A.   No.

(Whitt Dep.; R.112 at 5; Page ID #1272.)

They readily concede that they did no inspections or maintenance because the cornerstone of their defense is that they simply owed no duty in the first place, as they claim they had no control whatsoever over the exterior hangar doors.  As shown above, that cornerstone crumbles under basic premises-liability case law.

Then—having done no inspections whatsoever—the County and Attitude come up with a puzzling argument in an attempt to escape a finding of breach: They claim that they had *no notice* of any problems with the door.  But that's the point:  They created their own lack of notice by failing to inspect the doors at all. Lack of notice is a defense only if one is already acting with ordinary care to

44

maintain premises so as to obtain notice of dangers. *See Yahn v. Mahoning Nat'l Bank*, 446 N.E.2d 1132, 1134 (Ohio Ct. App. 1982) ("[T]he plaintiff must show that the defendant had, *or in the exercise of ordinary care should have had*, notice of the hazard for a sufficient time to enable him, in the exercise of ordinary care, to remove it or warn patrons about it.") (emphasis added); *Klein v. Kroger Co.*, No. 96-135, 1997 Ohio App. LEXIS 176, at *8 (Ohio Ct. App. Jan. 24, 1997) ("Without proof that reasonable care was taken by [the store owner], the mere statement that no store employee had notice is not enough to show that [the store] did not breach its duty to [the plaintiff] to provide reasonably safe floors."); *Bussard v. Ohio Dep't of Transp.*, 507 N.E.2d 1179, 1183 (Ct. Cl. Ohio 1986) (lack of proper inspection schedule is a failure to exercise proper care and can give rise to finding of constructive notice).

This is why, as in the cases discussed earlier, owners of premises who chose not to maintain and inspect the portions of premises in their control cannot then claim they lacked of notice of the danger they chose not to learn of. *See Friedl*, 23 N.E.2d at 240 ("The fact that the owner had no knowledge of its dangerous condition does not relieve him from liability to the pedestrian on the sidewalk any more than would lack of knowledge of the dangerous condition of any other part of the outside of the building."); *Both*, 331 P.2d at 143 (noting that owners' liability

45

for defective exterior of building is for failure to correct "such defects within the portion of the building under their control as would have been revealed by reasonable inspection"); *see also Stackhouse v. Close*, 94 N.E.2d 746, 747 (Ohio 1911) (acknowledging owner's argument that he did not have "anything to do" with the structural changes alleged to be defective and explaining "that is where his fault lies").

Similarly, the County and Attitude cannot rely on their years of choosing not to maintain the premises in their control as a basis to insulate themselves from any responsibility over the hazards on those premises. Landowners cannot cover their eyes at while at their dangerous property and later contend that they never saw the danger.[2]

---

[2] But it's even worse: Despite their failure to conduct any inspections, Defendants actually *did* receive notice of issues with the doors on T-hangar 12— just six weeks before Washburn's tragic injury in July 2008. On June 5, 2008, the doors were vandalized, and the hasps to the door were damaged. Both the County and Attitude were aware of this. (Watson Dep.; R. 27 at 7–9; Page ID #95. County Incident Report; R. 138-2; Page ID #2397.)  And they still never inspected the doors.  And while causation is not at issue in this appeal (it is for the jury), proper maintenance would have revealed dangers, including that the doors lacked a clamp that would keep the wind from taking them into the air and that there were wind problems with the doors (even such that Watson had tied rope around them). Moreover, the Defendants continually remark that these are the only hangar doors that flew off of their hangar.  They are missing the obvious explanation:  These hangar doors were deteriorated and dangerous.

At the very least, there remains an issue of fact regarding breach such that this issue could not be resolved as a matter of law in Defendants' favor on summary judgment. Even the County has conceded this point. Oddly, despite the County's concession, the district court on its own concluded that there was no breach as a matter of law. In its brief on this point in the district court, the County included a section titled, "Whether Lawrence County breached a duty owed to plaintiff is a question of fact." (County SJ Opp.; R. 132 at 18; Page ID #2326.) The County then properly cited Ohio law for the proposition that, "Generally, whether there has been a breach of a duty is a question of fact." (*Id.*) The County next stated that there is "an issue of fact as to whether any maintenance on the door was ever needed," and that "there remains an issue of fact as to whether Lawrence County breached a duty owed to plaintiff." (*Id.* at 20; Page ID #2328.) The district court was mistaken when it concluded that there was no breach as a matter of law, especially when the County admitted that this was a remaining factual question. Both the County's and Attitude's plain admissions that they did no routine maintenance or inspections establish a breach of their duty.

47

## CONCLUSION

The County and Attitude owed a duty of reasonable care to Ashley Washburn when she was nearly killed by an exterior hangar door that flew into her while she was on the public airpark grounds.  They concede that they never checked to see if the hangar doors posed a danger, and Washburn is entitled to have a jury decide whether she should be compensated for her devastating injuries.  This Court should reverse and remand for trial.

Respectfully submitted,

/s/ David E. Mills
David E. Mills (OH 0075400)
THE MILLS LAW OFFICE LLC
1300 West Ninth Street, Suite 636
Cleveland, OH 44113
Tel. (216) 929-4747
dm@MillsFederalAppeals.com

William L. Mundy (OH 0066163)
MUNDY & ASSOCIATES
P.O. Box 2986
Huntington, WV  25728
Tel. (304) 525-1406
wlmundy@mundynelson.com

Michael A. Woelfel (WV 04106)
Matthew J. Woelfel (WV 10393)
WOELFEL & WOELFEL LLP
801 8th Street
Huntington, WV 25701
Tel. (304) 522-6249

*Counsel for Ashley Washburn*

48

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief is written in a proportionately spaced, 14-point Equity Text A font, and contains 11,538 words, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/ David E. Mills
David E. Mills

*Counsel for Ashley Washburn*

49

# CERTIFICATE OF SERVICE

I certify that on November 13, 2012, I filed the foregoing electronically with the Clerk of the United States Court of Appeals for the Sixth Circuit.  The Court's ECF system will automatically generate and send by e-mail a Notice of Docket Activity to all registered attorneys currently participating in this case, constituting service on those attorneys.

/s/ David E. Mills
David E. Mills

*Counsel for Ashley Washburn*

# ADDENDUM:
## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| R. | Description |
|---|---|
| 1 | Complaint |
| 27 | Watson Deposition |
| 73-2 | Hospital Discharge |
| 103-1 | LeMaster Affidavit |
| 107-1 | Washburn SJ Memorandum |
| 107-4 | FAA Airport Compliance Handbook (excerpts) |
| 109 Ex.3 | Grant Agreement |
| 110 | Stephens Deposition |
| 112 | Whitt Deposition |
| 113 | Meade Deposition |
| 116 | Washburn Deposition |
| 117 | LeMaster Deposition |
| 118 | Kohn Deposition |
| 128 | Attitude SJ Memorandum |
| 129-2 | Attitude Lease |
| 131-1 | County SJ Memorandum |
| 131-10 | T-hangar 12 Lease |
| 132 | County SJ Opposition |
| 140 | County SJ Opposition to Attitude |
| 141 | Attitude SJ Opposition to County |
| 153 | District Court's Summary-Judgment Opinion |
| 154 | Judgment |
| 155 | Notice of Appeal |